Robert HAMMOND, Petitioner,

v.

O. M. BOSTIC, Superintendent, Monroe, North Carolina Unit, North Carolina Department of Correction, and State of North Carolina, Respondents.

No. C-C-73-102.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 29, 1973.
On Motion for Reconsideration
Feb. 8, 1974.

Richard N. League, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N. C., for respondents.

ORDER

McMILLAN, District Judge.

On July 18, 1972, Robert Hammond, petitioner, was convicted in the Superior Court of Mecklenburg County, North Carolina, of possession of heroin, and is now in the custody of the Monroe, North Carolina prison unit serving a three-year sentence for that offense. He seeks habeas corpus upon four grounds, the first of which is his claim that the search of his person, pursuant to an arrest for speeding, which uncovered the heroin, was in violation of the Fourth Amendment and that his conviction based on that heroin as evidence was unlawful.

Hammond attracted the attention of the police by driving an estimated seventy miles per hour in a forty-five miles per hour zone in Charlotte. He was stopped and arrested. The arrest, under the circumstances, was proper.

Following the arrest he was searched. One arresting officer described the search as follows:

"Q. All right. Now, what did you do after you placed him under arrest?

 .    .    .    .    .    .

A. I took him back to the back seat or the back door of the patrol car, where I placed his hands up on the car and searched him.

Q. Did you observe anything about him before you searched him?

A. There was a bulge in both of his front pockets.

Q. What, if anything, did you find upon searching him?

 .    .    .    .    .    .

A. In his left front pocket I found some glassine bags wrapped in rubber bands, which I later found out to be heroin." (Tr. 6–7)

Another version of the search was:

"Q. Then what happened after you placed him under arrest for speeding?

A. I had him to walk back to the rear of the patrol car, to the back seat door, to the back door, where I placed his hands up on the car and searched him.

Q. What, if anything, did you find as a result of the search?

 .    .    .    .    .    .

A. In his left front pocket I found twenty-two bags of heroin." (Tr. 17)

And a third version was:

"Q. What happened after Officer Ryals placed him under arrest?

A. We took him to the right side of the rear door, and the subject was searched for a weapon.

Q. What, if anything, did you see Officer Ryals find on the defendant while you were searching him for weapons?

. . . . .

A. Sir, upon the search, we found some glossy little bags about this big." (Tr. 33)

From the complaint report filed by Officer C. R. Ryals, it is clear that the garment in which the bulges were observed was Hammond's *pants* (not his coat), and that, though there were bulges in both front pockets, only one pocket contained heroin.

Defendant objected to the evidence of the discovery of heroin in his pocket. The objections were overruled and the trial judge found that the "search of defendant's person was incident to a lawful arrest, and the fruit of such search was admissible in evidence."

There was no testimony that any of the three officers believed or suspected that Hammond was concealing a weapon. The offense (speeding) is not one which normally creates an inference that the person arrested is armed. No one said or suggested any suspicion that Hammond was armed. (He was not in fact armed.)

In Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), the Supreme Court said:

". . . [T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to *a few specifically established and well-delineated exceptions.*' [Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576.] The exceptions are 'jealously and carefully drawn,' [Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514.] and there

must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' [McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153.] '[T]he burden is on those seeking the exemption to show the need for it.' [United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59.] In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won . . . a right of personal security against arbitrary intrusions by official power . . . ." (Emphasis added.)

In Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), the Court reaffirmed the general rule that warrantless searches are "unreasonable." See also, Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 2543, 37 L.Ed.2d 596 (1973). (Mr. Justice Powell, concurring).

Some searches incident to lawful arrests are within the exception to the warrant requirement. However, the state does not gain *carte blanche* right to search merely by lawfully arresting a person. The arrest deprives the person of his *liberty* to move freely; it does not necessarily, however, deprive him of his right to *privacy.* Any incursions into a person's privacy must be carefully limited to *the quantum necessary to protect valid state interests;* any excess is unconstitutional. This principle is the foundation of Supreme Court decisions involving administrative searches and so-called "stops and frisks." Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1863, 20 L.Ed.2d 889 (1968). See United States v.

Robinson, 153 U.S.App.D.C. 114, 471 F.
2d 1082 (1972), cert. granted, 410 U.S.
982, 93 S.Ct. 1500, 36 L.Ed.2d 177
(1973), where Judge Wright extensively
reviews the subject. (Certiorari was
also granted the same day to a state
court case involving the same issue, Gus-
tafson v. Florida, Fla., 258 So.2d 1, cert.
granted, 410 U.S. 982, 93 S.Ct. 1494, 36
L.Ed.2d 177.) See also People v. Ad-
ams, 32 N.Y.2d 451, 346 N.Y.S.2d 229,
299 N.E.2d 653 (1973), where New
York's highest court adopts the *Robin-
son* analysis.

The most recent Supreme Court dis-
cussion of the "search incident to ar-
rest" exception to the warrant require-
ment of the Fourth Amendment explicit-
ly takes account of the principles noted
above:

> "When an arrest is made, it is rea-
> sonable for the arresting officer to
> search the person arrested in order to
> remove any weapons that the latter
> might seek to use in order to resist
> arrest or effect his escape. Other-
> wise, the officer's safety might well
> be endangered, and the arrest itself
> frustrated. In addition, it is entirely
> reasonable for the arresting officer to
> search for and seize any evidence on
> the arrestee's person in order to pre-
> vent its destruction." Chimel v. Cali-
> fornia, 395 U.S. 752, 762–763, 89 S.Ct.
> 2034, 2040, 23 L.Ed.2d 685 (1969).

From *Chimel* and from Preston v. Unit-
ed States, 376 U.S. 364, 367, 84 S.Ct.
881, 11 L.Ed.2d 777 (1963), it appears
obvious that the "evidence on the arres-
tee's person" is not just such evidence of
crime, generally, as might be found
there, but is evidence of *"the crime"* for
which the person was arrested.

It cannot seriously be contended that
a search of Hammond's person was nec-
essary to discover evidence of the misde-
meanor (speeding) for which he had
just been arrested. Had Hammond been
arrested for driving under the influence
of drugs or liquor, such a contention
might be supportable; but he *was* ar-
rested only for the routine misdemeanor
of going too fast. The search must then

be justified, if justified at all, on the
theory of a search incident to arrest, for
*weapons* on the arrestee's person.

Terry v. Ohio, 392 U.S. 1, 88 S.
Ct. 1868, 20 L.Ed.2d 889 (1968) is
a key decision. *Terry* points out that
the search process—even for weapons—
must proceed in incremental stages. A
"frisk" can take place only if there is
some reason to believe that the person
frisked has a weapon in his possession.
The next step, entry into the clothing it-
self, can take place only after the exter-
nal frisk has given further reason to be-
lieve the weapon is there.

*Terry*, of course, did not concern a
person who had already been arrested;
however, as pointed out by Judge
Wright in Robinson v. United States,
153 U.S.App.D.C. 114, 471 F.2d 1082
(1972), there is no reason why its prin-
ciple should not apply even after arrest.
There is a *per se* right to frisk any ar-
restee who must be taken down to the
police station.

> ". . . [I]t would seem clearly un-
> reasonable to expect a police officer to
> place a suspect in his squad car for
> transportation to the stationhouse
> without first taking reasonable mea-
> sures to insure that the suspect is un-
> armed. We therefore conclude that
> whenever a police officer, acting with-
> in the bounds of his authority, [foot-
> note omitted] makes an in-custody ar-
> rest, he may also conduct a limited
> *frisk* of the suspect's outer clothing in
> order to remove any weapons the sus-
> pect may have in his possession."
> *Robinson*, at 1098.

However, there is no right to enter the
clothing unless the frisk generates a rea-
sonable suspicion that a *weapon* exists.
Entering one's clothing is a significant
further breach of privacy, an intrusion
wholly independent of the restriction of
movement caused by an arrest.

> ". . . And in justifying the par-
> ticular intrusion the police officer
> must be able to point to specific and
> articulable facts which, taken together
> with rational inferences from those
> facts, reasonably warrant that intru-

sion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. See also *id.*, at 27, 88 S.Ct. 1868.

To reject the *Terry* principle merely because the person has been arrested would be to collapse the distinction between liberty and privacy. *Terry* "implicitly acknowledged a continuum of privacy values in which the security of one's pockets ranks higher than a temporary interference with freedom of movement. Arrest *per se* should not alter this relationship—an individual's interest in the security of his pockets does not cease simply because he is arrested." Note, Restricting the Scope of Searches Incident to Arrest: United States v. Robinson, 59 Virginia Law Review 724, 737 (1973). Protection of the safety of the police during arrest does not require that a person arrested for speeding be deprived of *his* (or her) right to even minimal privacy. If it were held that police are entitled to *total* security from the threat of weapons, then the total deprivation of privacy would follow. "To take an extreme example, a razor blade could readily be sewn into clothing, and so support a purported limited search for weapons which included shredding a suspect's clothing or dismantling his shoes." United States v. Del Toro, 464 F.2d 520, 522 n. 6 (2nd Cir. 1972).

It is important to note again the nature of the crime—speeding—for which Hammond was arrested. Speeding is not a crime whose perpetrators are ordinarily suspected of being armed. The obvious authority to search the person of a suspected bank robber for concealed weapons does not, *per se*, extend to searches of the person in arrests following routine traffic violations, even those requiring that the arrestee be taken to the magistrate, as was the situation in this case.

Pockets are made to carry personal property. Some of us do carry things (wallets, handkerchiefs, keys, cigarettes, pipes, tobacco pouches) in pants pockets. A bulge in a speeder's pocket is not a normal basis for suspicion that the pocket contains a dangerous weapon. An external "frisk" or pat-down could very easily reveal whether a bulge was or might be a weapon, rather than a more yielding material.

The evidence in this case does not support the search either to find evidence of the crime of speeding or to discover weapons; and it is not supportable simply as a routine part of a speeding arrest.

Taking the evidence presented by the police at the trial below ·in its most favorable light, then, there are not evident the "specific and articulable facts" which are necessary in order to warrant the breach of privacy wrought by a search of one's clothing. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. The scope of a search must be supported at least by reasonable suspicion. United States v. Diamond, 478 F.2d 1400; United States v. Haven, 478 F.2d 1400 (4th Cir., decided together, June 20, 1973). See also United States v. Poms, 484 F.2d 919 (4th Cir., 1973), where emphasis is placed on the presence of a factual basis for a "limited protective search." 484 F.2d at p. 922.

The search of the pocket which uncovered the heroin was unconstitutional; the evidence should have been suppressed.

In his second claim, Hammond alleges that he was not warned of his constitutional rights following his arrest or, indeed, at any time subsequently. Such failure to warn gives rise to no relief because no evidence was introduced against him that depended on any statement of Hammond's.

In his third claim, Hammond alleges that the prosecutor improperly attempted to influence the jury by introducing evidence of a non-existent previous arrest for a narcotics violation. The record does not factually support this contention, and it would not be a constitutional error if it did.

Finally Hammond alleges in effect that he was "framed." He says that he never had narcotics in his pos-

session, and that the police placed on him at the police station the evidence that was subsequently introduced at trial. Hammond presents no evidence that this happened, and the jury finding, based on the testimony, that the heroin was in fact on him at the time of arrest is conclusive on this review. by this court.

It is therefore ordered:

1. That the petition for habeas corpus is granted.

2. That petitioner be released from custody within thirty (30) days from this date unless within such thirty (30) days the state elects to re-try petitioner and notifies this court in writing, by communication received by this court within said thirty (30) days.

3. That if the state elects either to re-try petitioner or to appeal this decision, the state shall cause petitioner to be brought before this court before the expiration of thirty (30) days from to-day, for a hearing on the question of bond or release upon the petitioner's recognizance.

4. That O. M. Bostic, Superintendent of the Monroe Unit of the North Carolina Department of Correction, is made a party defendant.

### ON MOTION for RECONSIDERATION

After this court's November 29, 1973 order was entered, the United States Supreme Court by a six to three vote in Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456, 1973, held that a lawful custodial arrest of a motor vehicle operator for failure to have his driver's license in his immediate possession is justification, without more, for a full scale search of the person of the operator, and that evidence discovered in the course of this search may be used as the basis of a criminal prosecution for unlawful possession of marijuana.

Defendants, in light of Gustafson and companion cases, have moved for reconsideration of this court's November 29, 1973 order.

Although I agree thoroughly with the Supreme Court dissenters rather than with the majority in the remarkable Gustafson decision, it is obvious that this case would on appeal be controlled by Gustafson.

Therefore, in deference to the superior force and authority, though not to the principles, of Gustafson and companion cases, I find it my duty to save the state an unnecessary appeal, and to reverse the prior order.

Accordingly, it is ordered, that this court's order of November 29, 1973, insofar as it grants relief to petitioner, be and it is hereby reversed.